## Case No. 2,517.

### CATLETT et al. v. PACIFIC INS. CO.

[1 Paine, 594.] [2]

Circuit Court, D. New York. Oct. Term, 1826.

CIRCUIT COURTS — JURISDICTION — CITIZENSHIP — PLEADING AND PROOF— RESIDENCE TO ACQUIRE RIGHT TO SUE—EVIDENCE — SHIP'S REGISTER—RECORD OF CONDEMNATION—MARINE INSURANCE — THE POLICY — CONSTRUCTION — EXTRINSIC PROOF—JOINT AND SEVERAL INTERESTS—WAIVER OF ABANDONMENT.

1. The averment of the citizenship of the parties, to give jurisdiction to a circuit court, is a necessary averment, and must be proved under the general issue. It is not necessary that a citizen, removing from a territory of the United States, or a state, into another state, should acquire all the rights of a citizen of the state into which he removes, by the laws of such state. It is sufficient if he acquire a domicil there. Yet the declaration must aver that he is a citizen of the state: not sufficient to aver that he is a resident. Difficulty in understanding the term citizen, as used in the constitution.

[Cited in Burnham v. Rangeley, Case No. 2,-176; Prentiss v. Brennan, Id. 11,385; Smith v. Atlantic Mut. F. Ins. Co., Id. 13,-005.]

2. If one make such removal with the avowed object of acquiring a right to sue in the circuit courts, but with the intention of a permanent residence, and not to return, it is not a fraud upon the law.

[Cited in The Garland, 16 Fed. 288.]

3. The register of a vessel is the only document which need be on board during a period of universal peace, in compliance with the warranty of national character.

4. It is the original register which is required by law to be transmitted, on the loss of a vessel, to the register of the treasury to be cancelled: And as it is the practice not to destroy the register after it is cancelled, it is a document required by law to be deposited in the register's office; and a duly certified copy is legal evidence.

[Cited in The Missouri, Case No. 9,653.]

5. The record of condemnation of a vessel, in a court of vice-admiralty, is not evidence per se. The seal does not prove itself, but must be proved by a witness who knows it: or the handwriting of the judge or clerk must be proved: or that it is an examined copy. The certificate of the American consul is not sufficient to authenticate it.

6. The testimony of the captain, that a survey was held on the vessel, and that the surveyors reported that she could not be repaired but at too great an expense, and that she was thereupon condemned on his application; although not evidence of these proceedings, was held to be evidence that he coincided with the surveyors in opinion.

7. An averment that the plaintiffs have an entire interest in themselves in the subject insured, cannot be supported by evidence of a joint interest with others.

[Cited in Howard Fire Ins. Co. v. Chase, 5 Wall. (72 U. S.) 511.]

8. Nor can an averment of a joint interest with others, be supported by proof of a sole interest.

9. The plaintiffs purchased, separately, each a moiety of the cargo, which was specie, and instructed their agent to get it insured on their joint account. The agent effected the insurance, but the policy was expressed to be on account of owners: afterwards, one of the plaintiffs transferred half his share to the person who was to go in the vessel as supercargo. Held, that the term "owners," was descriptive of the persons intended to be insured, and referring to matters out of the policy, was open to explanation by extrinsic proof.

10. As the underwriters understood, when they made the insurance, that it was on account of the plaintiffs only, it was held, that they could not set up that the supercargo became an owner before the commencement of the risk.

11. The bill of lading, on its face, and the other papers, showed that the interest of the three owners, after shipment, was joint: but there was an endorsement on the bill of lading, stating that one half the cargo was the property of one of the plaintiffs, and the other half, the property of the other plaintiff and the supercargo: Held, that the endorsement was intended only to show the extent of each owner's interest; and that the separate purchase of the cargo, together with the endorsement, did not prove that their interests were several.

12. Before the end of the voyage, it was broken up, and the insured abandoned on learning the fact. The instructions to the master and supercargo, showed that the rights and duties of the latter, as supercargo, were not to commence until the end of the voyage. On the loss of the voyage, the master delivered the specie to the agent of the supercargo, and it was invested in cotton. Held, that as the supercargo was not interested in the policy, his acts did not bind the other joint owners; and that his capacity of supercargo suspended whatever powers he might have had as a partner, and that the investment by him of the specie,

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Elijah Paine, Jr., Esq.]

was as agent for the underwriters, and did not constitute an act of ownership, so as to waive the abandonment.

At law. This was an action of assumpsit [by Charles I. Catlett and James Keith, Jr., against the Pacific Insurance Company of New York], on a policy of insurance, on the cargo of the brig Sphinx. The questions decided arose on a motion for a nonsuit. The policy, which was in the common form, and dated on the 2d of February, 1818, purported to be effected by Le Roy, Bayard & Co., on account of the owners, upon all kinds of lawful goods and merchandises, laden or to be laden, on board the good American brig called the Sphinx, at and from Alexandria, Columbia, to Canton, and at and from thence back to Alexandria; beginning the adventure on said goods from and immediately following the loading thereof on board the said vessel at Alexandria, &c. The amount insured was 30,000 dollars. The declaration contained two special counts, the first of which, after setting out the policy, averred an undertaking of the company to insure the plaintiffs; and that 30,000 Spanish milled dollars were shipped at Alexandria on board the Sphinx; and an interest in the plaintiffs: That said vessel, on the 31st of March, 1818, sailed on her said voyage, in the course of which, she was, with the said goods, wholly lost.. The averment of loss in the second count, was as follows: That the vessel having been disabled by the perils of the seas, was obliged to seek a port; and on the 31st of July, 1818, having reached the isle of France, a survey was held upon her, and the surveyors reported that she could not be repaired but at a cost of 20,000 dollars; whereupon the vessel was sold by a decree of the court of vice-admiralty, and the voyage broken up, and the plaintiffs abandoned to the defendants the part of the cargo insured by them.

The court having decided that the preliminary proof was sufficient, the plaintiffs introduced the following evidence, subject to exceptions: The policy, and invoice of the cargo. A copy of the register of the vessel, certified by Joseph Nourse, register of the treasury of the United States, to be a true copy of the original register on file, in the registry-office, which certificate was duly authenticated by the secretary of the treasury. The deposition of Peyton R. Page, the master of the vessel, taken under the act of congress. He testified that the cargo of the vessel, when she sailed from Alexandria, on the 31st of March, 1818, consisted of twenty-two kegs and seventeen boxes, containing 90,000 Spanish milled dollars, and of twenty-four barrels of ginseng. That on the 5th of April, the brig met with an injury in the Potomac, which it took until the 11th of April to repair. Proceeding on her voyage, she had bad weather, which caused the vessel to labour and strain very much, and the oakum worked out of her seams next the copper, in consequence of which she leaked considerably, and it was thought advisable to bear away for Madeira to repair. There she was calked, and on the 16th of May, proceeded on her voyage. From the 20th of June to the 16th of July, they had very heavy weather, and rough seas, the vessel labouring and leaking badly. On the 16th day of July, she encountered one of the heaviest gales of wind the deponent ever knew, and was so much strained, that the next day she made three feet water in fifteen minutes, and all the pumps kept her free with difficulty. The seams on the larboard side were open abreast and abaft the mainmast, the length of five feet. The stone ballast, guns, and spare spars were thrown overboard. The vessel worked in a frightful degree, so that the decks and beams were constantly in motion. The weather moderating on the 21st, the crew covered the seams with canvass, which diminished the leak, but the brig continued to work as if going to pieces. All hands were unanimous for making for the first port, and on the 29th of July, they arrived at the isle of France. A survey was held on the 31st of July, and the cargo having been landed by order of the surveyors, they again went on board on the 14th of August, and had the brig opened in various places, when it was found, deponent being present and seeing it, that eight of her puttocks were broken on her larboard side, and two or three on her starboard side. And the said surveyors reported, that the said brig could be repaired, but that it would cost to repair her there, as much as 20,000 dollars; upon which report, and upon the request of deponent, the court of vice-admiralty, in the isle of France, ordered the said brig to be sold, and she was sold accordingly. There was no opportunity to send on the cargo to Canton. Annexed to Page's deposition were the bill of lading, his letter of instructions, and the letter of instructions to Thomas R. Keith, the supercargo.

The bill of lading purported that 90.000 Spanish milled dollars, marked and numbered in the margin, 22 kegs, 17 boxes, were shipped on board the Sphinx, by Charles I. Catlett, James Keith, Jr., and Thomas R. Keith; to be delivered at Canton, to Thomas R. Keith, supercargo, on board, or his assigns. On the bill was the following endorsement:

45,000—say forty-five thousand dollars, the property of James Keith, Jr., and Thomas R. Keith.
45,000—say forty-five thousand dollars, the property of Charles I. Catlett.
_____
$90,000

The letter of instructions to Captain Page, which contained all his instructions, was as follows: "Alexandria, March 28, 1818. Capt. Peyton R. Page, Dear Sir—You will please take command of the brig Sphinx, and proceed from hence to Canton, in China, where

you will deliver your cargo to Mr. Thomas R. Keith, supercargo on board. Mr. Keith will furnish you with a return cargo, with which you will please proceed from Canton, with all possible despatch, direct to this port, guarding against any deviation that might affect our insurance; and we wish you to be very particular to conform to the laws and customs of China.—Wishing you a pleasant voyage, we remain your friends and servants, Charles I. Catlett, James Keith, Jr."

The letter of instructions to Thomas R. Keith. the supercargo, was as follows: "Alexandria, March 26, 1818. Mr. Thomas R. Keith. Dear Sir—We have shipped on board brig Sphinx, Peyton R. Page, master, ninety thousand Spanish dollars, to your address, which we wish you to invest on your arrival at Canton. in the articles named in the annexed memorandum. If our money should not be sufficient to load the brig back, you are at liberty to negotiate a credit in Canton, for a sum not exceeding thirty thousand dollars; and for this object we hand you a power of attorney, and letters from our highly respectable friends, Messrs. James and Thomas H. Perkins, of Boston, and Le Roy, Bayard & Co., of New-York, which, we trust, will enable you to obtain a credit on the most favourable terms. As a compensation for your services, we agree to allow you three per cent. commission. Relying upon your best exertions to promote our interest. and wishing you a pleasant voyage, we remain your friends and servants, Charles I. Catlett, James Keith, Jr. P. S.—March, 28th, 1818.—If you cannot obtain freight, and find it necessary to fill up the brig, and can obtain credit upon such terms as you think favourable, you are at liberty to take a credit of sixty thousand dollars, instead of thirty thousand. Be careful to be placed upon the most favourable footing, as we shall be very careful to promptly comply with your engagements. Yours truly, Charles I. Catlett, James Keith, Jr."

The plaintiffs also gave Thomas R. Keith the following letter of attorney: "Know all men by these presents, that we. Charles I. Catlett and James Keith, Jr., of Alexandria, District of Columbia, have nominated and appointed, and by these presents, do nominate and appoint Thomas R. Keith, our agent and attorney, to transact our business in Canton. Also, to negotiate a loan, or purchase merchandise on a credit, hereby binding ourselves and our heirs to comply with all contracts made for our account in Canton, by said agent and attorney. Given under our hands and seals, the 28th day of March, 1818. Charles I. Catlett, James Keith, Jr. Sealed, &c. in the presence of A. Moore."

It appeared from this deposition, that after the vessel was condemned, Captain Page delivered the dollars to Mr. Bickham, the American consul at the isle of France, and the agent of Thomas R. Keith. He was selected by Page and Keith as the safest person they could get to take charge of it. Captain Page considering Keith as a part owner, thought himself justified in delivering the same to his agent, believing it to be the best course he could pursue for those who might be interested in the cargo. Not wishing to create any expense to the owners, in relation to himself, he engaged as a mate on board a ship, and left the isle of France. What became of the dollars he did not know, but had understood that they were laid out in cotton at that place. A copy of the proceedings, and condemnation of the vessel, in the court of vice-admiralty, at the isle of France, with a certificate of the American consul to authenticate it, was offered in evidence, without any other proof of its authenticity. The impression on the seal of the court was effaced.

The plaintiffs offered the following evidence, (besides the invoice, bill of lading and endorsement,) in relation to their interest in the policy: Charles I. Catlett and James Keith, Jr., each furnished a moiety of the 90,000 dollars, separately. After it was shipped, and between the 20th and last of February, James Keith, Jr., declared in the presence of Page and Catlett, that he had given to his brother, Thomas R. Keith, one-third of his interest in the shipment, and that he was to have one-third of the profits. James Keith, Jr., observed, that he presumed it would be an insurable interest, and Catlett agreeing with him said, that as they were short insured, he would write to Thomas H. Perkins, of Boston, to effect further insurance, and that Thomas R. Keith's interest should be insured in the Boston policy. Page believed that Thomas R. Keith had no interest in the shipment until about the time of this conversation. On the 4th of February, Perit & Cabot. of Philadelphia. gave Thomas R. Keith a letter to Messrs. Perkins & Co., introducing him as the supercargo of the Sphinx, belonging to the plaintiffs.

The letters to Le Roy, Bayard & Co.. and to Thomas H. Perkins, directing the insurance to be made, were as follows:

"Alexandria, January 29, 1818. Messrs. Le Roy, Bayard & Co. .Gentlemen—Will you have the goodness to effect insurance on joint account of Mr. James Keith, Jr., and myself, upon brig Sphinx, Captain Peyton R. Page, from Alexandria to Canton, and back to Alexandria, against all risks? Say on vessel 10,000 dollars, valued at this sum—On specie 70,000 dollars, provided it can be done in an office of unquestionable solidity, at or under six and a half per cent. The balance of the specie we can get insured here at that rate. The brig is in complete order. and will probably sale by the middle of February. Very respectfully your most obedient servant, Charles I. Catlett."

"Alexandria. March 5. 1818. Colonel Thomas H. Perkins. Dear Sir—If perfectly con-

venient, you may, if you please, effect insurance on specie out, and merchandise home, at and from Alexandria, to, at, and from Canton, back to Alexandria, with the usual privileges for trade and refreshments; say 26,-000 dollars, per brig Sphinx, Peyton R. Page, master, for account of James Keith, Jr., Thomas R. Keith, and Charles I. Catlett, if to be done at six per cent. Mr. James Keith, Jr., and myself, have already had insurance effected on 80,000 dollars. With esteem and respect, your most obedient servant, Charles I. Catlett."

William Bayard, Jun. of the house of Le Roy, Bayard & Co., testified that he went with his father to the office of the defendants to get the insurance effected; that his father went into the office with Catlett's letter, directing the insurance to be made, and that it was their practice to show such letters to the underwriters.

A letter was introduced from Catlett to Le Roy, Bayard & Co., dated the 7th of February, acknowledging the receipt of a letter advising James Keith, Jun. and Catlett of the insurance on the Sphinx and cargo. Thomas H. Perkins & Co. effected the insurance in Boston, agreeably to the directions of Catlett, at the office of the Suffolk Insurance Company, who subsequently paid the loss. John Wheelwright, who was called to prove the residence of the plaintiffs, testified, that James Keith, Jun. was a resident of Virginia. In December, 1824, Catlett removed to Virginia, and still resides there. About the time of his removal, he informed witness that, as a resident in the District of Columbia, he could not sue in the United States courts, and that he meant to procure a residence elsewhere, to enable him to sue. He said he intended to leave Alexandria, and not return, and to reside permanently in Virginia. On his removal he took a lease of a house in Virginia for one year.

On this evidence the plaintiffs rested their case; and,

T. A. Emmet and G. Griffen for the defendants, moved for a nonsuit on the following grounds:

1. That Catlett, as a citizen of the District of Columbia, could not sue in this court, and that he had not acquired the right by his residence in Virginia. In support of this position it was contended, that Catlett, having removed to Virginia with the avowed object of acquiring a residence so as to enable him to sue in the circuit court, it was an act in fraudem legis, and the right to sue in such court could not be acquired by it. It stood on precisely the same ground as the assignment of a chose in action for the same purpose, which had been decided not to give the court jurisdiction. And it was held to be immaterial that the assignment of the chose in action was for a valuable consideration; the decision was on the ground that it was an attempt to deprive the state courts of

their jurisdiction. What varies this case from that in principle? They are neither of them cases contemplated by the constitution.

2. That the plaintiffs had not proved the warranty that the Sphinx was an American vessel. The warranty of national character implies, that the vessel shall have the necessary papers on board to show such character. Phil. Ins. 127; 14 Johns. 314; 1 Condy, Marsh, Ins. 406. But no evidence has been offered to show that any such papers were on board during the voyage; and the vessel is not even proved to have been American. The transcript from the treasury department is but a copy of a copy, and as such cannot be evidence. It is not·the original register which is sent to the treasury department when the vessel is lost. That remains with the collector.

3. That the loss of the property insured was not proved. The loss is not pretended to have been an actual total loss, and the plaintiffs have not made out such a technical total loss as the law considers equivalent to an actual one. There is no proof that the Sphinx could not have been repaired at the isle of France. What the captain says of the proceedings of the surveyors and court of admiralty is not evidence. He should have given his own opinion as to her being reparable, and at what expense. This he has not done; he only says that some of her puttocks were broken. Why was he not called upon to prove the report of the surveyors, and the other proceedings of the court at Mauritius? Why were not the surveyors themselves examined?—for even a copy of their report, if established in proof, would not be evidence of the facts contained in it. [Marine Ins. Co. v. Hodgson] 6 Cranch [10 U. S.] 206, 219. The record of a court of vice-admiralty is only evidence of the fact of condemnation; but in this case there is no survey proved and no condemnation. The proceedings of the court of vice-admiralty are not evidence per se; and no proof has been offered of the seal, which is effaced, of handwriting, nor any thing else. It was not a court acting under the law of nations, but a municipal court of the country. The condemnation binds the rights of no one, but is a mere justification of the acts of the master. The question whether the voyage was properly broken up, is a question of law for the court to determine. King v. Delaware Ins. Co., 6 Cranch [10 U. S.] 71.

4. That there was a non-joinder of parties, Thomas R. Keith, one of the owners insured, not having been made a plaintiff. All the owners should have been joined. 16 Johns. 34. The policy is on account of owners. It is immaterial who were the owners when the policy was made. The question is, who were the owners when the policy attached; that is, on shipment of the goods? The bill of lading shows that at this time Thomas R. Keith was an owner. And the evidence of Page does not prove that he was not an owner even before

the insurance was effected; and what he says. is of a conversation of the plaintiffs in the absence of the defendants, and not evidence. The letters from Catlett to Bayard & Co. and to Perkins' are not evidence. It does not appear that the defendants knew when they insured that it was for the plaintiffs only. The letter from Catlett to Bayard is not proved to have been shown to them; and if it had been, parol evidence could not be admitted to alter the legal construction of the policy. All previous contracts and explanations are merged in the policy, and a court of equity—[Graves v. Boston Marine Ins. Co.] 2 Cranch [6 U. S.] 419 —alone can rectify it. What is the legal construction? That all the owners at the time of shipment were intended to be insured. The insurance is on goods laden or to be laden on board, and the risk is to commence from the lading. Probably there was no interest in any one when the insurance was effected. If partnership property is insured, it is on account of all the partners, unless it clearly appear to be for account of only some of them.

5. That there was a variance between the declaration and proof: The declaration averred a joint interest in Catlett and James Keith, Jun. and the evidence showed that their interests were several. [Graves v. Boston Marine Ins. Co.] 2 Cranch [6 U. S.] 419; 3 Starkie, 1159; 5 Taunt. 208; 16 East, 141.

6. That the plaintiffs had exercised acts of ownership over the property insured after abandonment, by investing the specie in cotton. Thomas R. Keith was one of the insured, and a partner with the plaintiffs in the specie, and his acts at the isle of France are binding upon them. He received the property as owner. Phil. Ins. 453; [Chesapeake Ins. Co. v. Stark] 6 Cranch [10 U. S.] 272. And this view of the case is the most agreeable to justice. The investment of the specie in cotton was a speculation made by him for their joint benefit, and because it proved to be a losing one, the loss ought not to be thrown upon the defendants; they did not undertake to insure against the fluctuations in the market. This was such an act of ownership as waived the abandonment. 10 Johns. 177.

D. B. Ogden and J. Duer for the plaintiffs, insisted—

1. That the defendants could not avail themselves of the objection, that Catlett was not a citizen of Virginia under the general issue; they should have pleaded it in abatement. But he has been proved to be a citizen of Virginia, and the court cannot inquire into his reasons for becoming so. He has brought himself within the constitution and laws, and is by their provisions entitled to sue in this court; and what power have the court to say that his case forms an exception? The case of a chose in action is not analogous; in that case congress were obliged to pass an act specially providing against a fraudulent assignment; and if they had not expressly interfered by law, this court must have entertained a suit where the consignment had been made merely to give the court jurisdiction. And this is the strongest argument against this position of the defendant's counsel. In the case of the chose in action, cited from Dallas, the assignment was considered by the court as collusive and without consideration, and no interest passed by it. Here there has been a real bona fide removal. The motive was not merely to give the court jurisdiction; it was a permanent removal.

2. The only document necessary to prove the national character of the vessel, was her register. 14 Johns. 314. The voyage was in a time of general peace, and the documents required during war could not be wanted. Evidence of American ownership is enough prima facie (2 Serg. & R. 133) to prove this warranty.

3. The proof of loss is sufficient. At any rate there is enough to go to the jury. The testimony of Page shows the injuries the vessel had sustained, and it is a reasonable inference from his conduct, and what he says of the report of the surveyors, that his opinion coincided with theirs. If the proceedings of the court which condemned her are not themselves in evidence, the captain does prove the facts that a report of unseaworthiness was made by the surveyors, and that the vessel was condemned and the voyage broken up.

4. It is true that all the parties interested in the policy must be joined. But Thomas R. Keith, although interested in the shipment, had no interest in the insurance. The construction of the policy is not necessarily that it was for all the owners. "Owners" does necessarily mean sole owners. There can be no doubt that the plaintiffs had a right to insure their separate interest; and the only question is, for whom was the insurance made? It was effected by Le Roy. Bayard & Co. as agents. Agents for whom? Certainly for their employers, who were the plaintiffs. They paid the premium, and were the only parties to the contract. Thomas R. Keith had nothing to do with it, and can have no interest in it. Even if Thomas R. Keith had been an owner at the time the policy was effected, which he was not, it would have made no difference, so long as those who effected the insurance were agents for the plaintiffs alone.

5. The averment of joint interest in the plaintiffs is proved. Why, if their interests were separate, are there no marks upon the boxes? Suppose a loss, who would have borne it? There is nothing by which each could know his own property. The memorandum on the back of the bill of lading was only to show their shares in interest; and is this to be received to disprove a partnership positively made out?

6. The fact of the investment of the specie in cotton is not made out. But suppose it were: The specie was to be delivered to Thomas R. Keith at Canton, and not before; and until it reached Canton, he had no right to interfere with it as joint owner, supercargo, or in any other capacity, for the owners. The master was the sole and exclusive agent for the owners during the voyage, and the only person whose acts could affect their rights. No one in case of loss had any right to interfere with the cargo except the master. And the abandonment constituted him an agent for the underwriters. If a speculation was made it was for their benefit. It is immaterial that Thomas R. Keith made the investment. He could have no right to act for the owners; and if he had any agency, it was as a sub-agent for the underwriters through the captain. The captain by his letter of instructions could not deliver the specie to Thomas R. Keith until their arrival at Canton. It is a mere inference, that Thomas R. Keith did make the investment for the benefit of the owners; there is no proof of the fact. It is also an assumption that he acted in the capacity of joint owner. Suppose the master a joint owner. Would his duty to act for the insurers be taken away because he was owner as well as master? It is said, that it is to be inferred from the nature of the act that it was done by Keith as joint owner, and for the benefit of the owners. But why? It was necessary to transport the specie from the isle of France—it could not remain there; and the cotton, for aught that appears, could be as easily transported. That the investment was a judicious one is no evidence that he acted for the owners and not for the underwriters. If he was acting for the benefit of the latter, it is to be presumed he would have acted judiciously. And the investment was such an act as if made for them would have been good. 1 Marsh. Ins. 170; 1 Term R. 621n. But if the act was conclusive against himself it did not bind his copartners, if they were such. If there was a copartnership, the abandonment dissolved it.

THOMPSON, Circuit Justice. I regret that the counsel have not thought proper to adopt the course I suggested, of putting this cause into the shape of a special verdict, or a case subject to the opinion of the court, so as to afford me an opportunity of giving a more deliberate consideration to the several points than have been raised on the motion for a nonsuit, than is practicable in the hurry of a trial. But as this course has not been deemed expedient, I must proceed and dispose of these questions according to first impressions.

1. It has been objected in the first place, that the plaintiffs have not shown themselves entitled, under the constitution and laws of the United States, to bring their action in this court. There can be no doubt but that under the present pleadings it is necessary for the plaintiffs to prove that they are citizens of Virginia, and that the defendants are citizens of New-York. It has been said on the part of the plaintiffs that the question cannot arise upon the plea of the general issue, but must be raised by a plea in abatement. This proposition I think cannot be sustained. The citizenship of the parties is a necessary averment in the declaration, and the want of it is error for which the judgment would be reversed. And by the plea of the general issue, the proof of all necessary averments is thrown upon the plaintiff.

The question for consideration then is, whether, in the present case, this averment has been proved. There is some difficulty in understanding, precisely, the sense in which the term citizen is used in reference to this question. A citizen of the United States is, to many purposes, a citizen of each state; and I am not aware that it has ever been held, that where there is a permanent change of residence by a citizen from one state to another, the party so removing must acquire all the rights and privileges of a citizen of the state to which he removes, according to the state laws, before he can come into the circuit court of the United States. It has been held, however, that it is not enough for the party to aver, that he is a resident or inhabitant of the state, but there must be an averment in the language of the law and constitution, that he is a citizen. This presents some difficulty then, as to the proof that will sustain such averment. But I am inclined to think it is sustained by proof of a permanent and fixed residence, under such circumstances that it may be said, that he has his domicil there. A mere temporary residence for some special purpose might not be sufficient. In the present case there is no question with respect to Keith, one of the plaintiffs. The objection only goes to Catlett, the other plaintiff. And with respect to him, the proof is substantially, that he removed from Alexandria into Virginia in December, 1824, avowing that one of the objects of his removal was to enable him to prosecute this suit in the courts of the United States, at the same time declaring, that it was a permanent removal, never intending to return again to reside in Alexandria—that he leased a house in Virginia, and had lived there ever since his removal with his family. It has been said that his declaration, that one object he had in view by the removal, was to enable him to bring this suit, makes it a fraud upon the law. I do not think it can be considered in this light. If he had avowed that his sole object was to place himself in a situation to bring this suit, with an intention of returning to his former residence when it was ended, it might have been considered a fraud upon the law. But if he deemed the privilege of bringing a suit in the courts of the

United States of sufficient consequence to justify a bona fide change of residence. he cannot be charged with a fraudulent evasion of the law, so as to make the act void. Whether it was a bona fide. or mere colourable removal, is a question for the jury. It is incumbent also on the plaintiffs to show, that the defendants were citizens of New-York; as a corporation there can be no citizenship. Their liability to be sued in this court must depend upon the citizenship of the individual members. The proof, with respect to them, is not very satisfactory; but as they are a company incorporated by a law of this state, and transacting their business in this city, it may be enough prima facie, to warrant the jury in finding that they are citizens of this state.

2. The next inquiry is, whether the assured have shown a compliance with the implied warranty in the policy, that the Sphinx was an American vessel. That she was American built. and owned by American citizens, is fully proved, so far as parol proof may be admissible to establish the fact, that the vessel was American property. The testimony of the captain is full on this subject. But it is said that this warranty not only implies, that the vessel was American property, but that she was duly documented as such, so as to show her national character. It was intimated by one of the counsel, that other documents than the register were necessary for this purpose, but it was not distinctly pointed out what those documents were; and the objection to this extent has not been urged by the other counsel. And I understand it, therefore, to be conceded, that an American register, if on board, would have been a compliance with this warranty; and I am not aware of any other document that could have been required. There being a state of universal peace, and no treaty provisions applicable to the voyage, the register was all that could be necessary to show the national character of the Sphinx. No question of neutral or belligerent rights could arise. This objection, however, under the testimony that has been offered. divides itself into two branches: (1) Whether the register has been sufficiently proved? (2) Whether it was on board the vessel? The proof of the register consists of the official certificate of Joseph Nourse, register of the treasury of the United States, that the document produced in evidence is a true copy of the original register on file in his office, together with a certificate of the secretary of the treasury, under the seal of the department, that Joseph Nourse is the register, and that the document is duly authenticated. It is said, however, that this is at best but a copy of a copy, and therefore not evidence. If the fact were so, the objection might be well founded. But, according to the provisions of the registry act, as I understand it, this is a copy of the original. The register is a document issued from the office of the register of the treasury, signed by the secretary of the treasury, and under the seal of the department. It is sent in blank in many parts to the collector of the port where it is to be used, and by him filled up as occasion may require; of which he is required to keep a copy in a record for that purpose provided, and also to transmit a copy of the same to the register of the treasury to be recorded; and when any vessel is lost, as in the present case, it is made the duty of the master to send the original register to the register of the treasury to be cancelled. And the document now produced is a copy of the original so returned. No further provision is made by the act for the disposition of the register after it is cancelled; but I believe it is the practical construction given to the act, not to destroy the register so returned, but to keep it on file in the office. It may, therefore, be well considered a document required by law to be deposited in the register's office, there to remain; and if so, a copy thereof was admissible, and was duly authenticated. The proof that the register was on board the vessel, is not very satisfactory. There are, however, some circumstances affording such a presumption, and this is matter for the jury.

3. The next objection is, that there is not sufficient evidence of the loss of the vessel. The proof offered to show the loss, consists of the vice-admiralty proceedings, on the survey and condemnation of the vessel at the isle of France, and the deposition of the captain. These admiralty proceedings were not offered in evidence until after the motion for a nonsuit had been made, and were admitted subject to objection, without any opinion having been expressed by the court as to their admissibility. These proceedings purported to be under the seal of the court, certified by the register, and accompanied by a certificate of the American consul, under his seal of office, that he was such register. These proceedings I think are not so authenticated as to entitle them to be read in evidence. The seal does not prove itself. There is no impression from which any conclusion can be drawn. that it is the seal of that or any other court: And some proof aliunde is always required, either that it is the seal of the court by a witness who knows the fact, or by proof of the handwriting of the judge or the clerk, or by an examined copy, compared with the original in the proper office, or some other evidence of a similar character. They do not alone, unaided by extrinsic evidence, carry with them that verity as to make them evidence in foreign courts. I attach no credit to the consular certificate. It has been said that he is an officer recognized by the law of nations, and entitled to credit. The law of nations recognizes him only in commercial transactions, but not as clothed with any authority to authenticate judicial pro-

ceedings. These proceedings must, therefore, be laid out of view. There is evidence, however, in the deposition of the captain tending to show the loss, and which must be submitted to the jury for that purpose. He describes the injury which made it necessary to put into the isle of France to repair, and swears that no other vessel could be obtained to carry on the cargo, which affords a strong inference that the Sphinx could not be repaired at that place, so as to prosecute the voyage at a less expense than that estimated by the surveyors. I do not mean to intimate that his testimony proves, or is admissible to prove, the proceedings of the surveyor, any further than will warrant the conclusion, that he coincided with them in opinion; he making the report of the surveyors the basis of his application for a condemnation of the vessel as unseaworthy: All which affords a pretty strong inference that, in the judgment of the captain, the vessel could not be repaired at that place at a less expense than twenty thousand dollars. At any rate, this is testimony proper to be submitted to the consideration of the jury, and the court cannot say there is no evidence of loss.

4. The next objection is, that the averments in the declaration are not supported by the proofs in the cause—that the averment is, a joint interest in the plaintiffs in this cause, and that the proof shows that Thomas R. Keith was either jointly interested with them in the specie insured, or that there was no joint interest in the three, but a separate interest in one moiety in Catlett, and a joint interest in the other moiety in the two Keiths, and that in neither case does the evidence support the averment. This necessarily calls for the inquiry, in the first place, for whom was this policy effected, and whose interest does it cover? The policy is in the name of Le Roy, Bayard & Co. and on account of owners. And it is said on the part of the defendants, that this is on account of the owners at the commencement of the voyage, and when the policy attaches, and not the owners when the policy is effected. This perhaps would be the legal construction, in the absence of all proof, explanatory of the term owners as used in the policy. It is very well established by the evidence, that Thomas R. Keith had no interest in this specie when this policy was underwritten; and that in point of fact, the only interest intended to be insured, was that of the plaintiffs in this cause. There can be no question but that one or more joint owners may insure their interest in joint property. The only question to be determined is, whether it has been done in this instance. It is equally clear, that if the insured aver an entire interest in themselves, in the subject insured, such averment cannot be supported by evidence of a joint interest with others. Nor can an averment of a joint interest with others, be supported by proof of a sole interest. As I understand the declaration in this cause, it only avers a joint interest in Catlett and James Keith, Jr., to the extent of thirty thousand dollars, and not an exclusive interest in the entire cargo. Will the policy then admit of the construction, that the insurance is for the benefit of Catlett and James Keith, Jr., and not for the benefit of Thomas R. Keith? It must be borne in mind, that application for insurance was not made by the plaintiffs themselves, but through their agents, pursuant to instructions; and the policy was filled up in the name of the agents for account of owners. The term "owners," is only descriptive of the persons intended to be insured, and they cannot sue on the policy without bringing themselves within that description. It is equally important and necessary, that they should show for what owners the agent acted, or who were intended to be insured under that description. Owners may include all concerned in interest, but such a construction is not necessarily to be given to the instrument. It is a proper subject for explanation. It does not contradict the policy to show who were the owners intended to be insured. The term "owners," as here used, necessarily refers to matter out of the policy, and cannot be explained by any thing appearing on the face of the instrument. It must, of course, be open to explanation by extrinsic evidence.

It certainly does appear from the facts, that no property was intended to be covered but the property of Catlett and James Keith, Jr. Whatever may have been the interest of Thomas R. Keith, it is manifest that Catlett, in instructing his agent to insure, did not mean that he should insure Thomas R. Keith's interest, but only his own and James Keith, Jr.'s, for Thomas R. Keith had not, at that time, any interest in the specie. If the underwriters understood when they underwrote the policy, that it was the agent's intention to insure only for Catlett and James Keith, Jr., and not for Thomas R. Keith, they cannot now set up that he was one of the insured, because he afterwards became part owner; for they never undertook to insure his interest. Their contract was with Catlett and James Keith, Jr., and no one else. That such was the understanding of the underwriters, is very satisfactorily made out. It is objected, that under this policy Thomas R. Keith might recover as one of the insured. But, I think, that the letter of instructions to Le Roy, Bayard & Co. would always be an insuperable obstacle to any such recovery.

The next question is, whether the evidence shows a joint property in Catlett and James Keith, Jr., conformably to the averment in the declaration. No circumstance has appeared from which it has been attempted to infer that their interests were separate, except the endorsements on the bill of lading. The bill of lading, on its face, the invoice, and all the papers which bear on this question, show that their interest was joint. And I consider the endorsements as made merely

for the purpose of showing the extent of the interest of each owner, and not to contradict the bill of lading on its face. But it is said they furnished their proportions separately: It is certain that each purchased a moiety separately; but this proves only that they were separate owners before the specie was shipped; but it proves no more. When it was put on board, their joint interest commenced. The object was not to purchase it jointly, but to ship it jointly; and a joint ownership, after it was shipped, is sufficient. Besides this, there is no evidence of separate interests. There were no marks on the bill of lading to show that the plaintiffs intended to be separate owners, or to enable any one to identify the property of each. I disregard entirely the marks on the manifest, contained in the admiralty proceedings, as they have been entirely excluded, as not having been properly authenticated.

5. The only remaining objection that has been urged in support of this motion is, that on the breaking up of the voyage, at the isle of France, the specie was delivered by the captain to Thomas R. Keith, one of the part owners, and by him invested in cotton. This, it is said, exonerates the underwriters from all responsibility. The legal effect and operation of this act must depend upon the character in which Thomas R. Keith is to be considered as acting. If the view which I have taken of this case, under the last objection, be correct, he is not a party to this policy, and his interest in the cargo is in no manner covered or protected by it. And if the plaintiffs are to be bound or prejudiced by his acts, it must be by reason of their connexion as part owners. In all the cases which have been referred to, where the acts and interference of the owners, have been held to take away the right of abandonment. or to waive it, if made—they were the assured. In such case it is just and reasonable that the acceptance of the cargo, at any intermediate port, should discharge the underwriters. The master of the vessel, in whose possession the cargo is placed, is their agent, and they may revoke his authority, and take the cargo into their own hands. They are the only parties interested in the policy, and have the right to discharge it: But it by no means follows, that such authority is vested in one of the joint owners who has no interest in the policy. It has been said that the joint owners were partners, and that the law applicable to the rights of partners, must govern this case; and that the act of one, in judgment of law, is the act of all. There is no doubt, but in partnership transactions, all the partners are bound by the acts of each which fall within the scope of the partnership. But I cannot consider this such a case. The rights and authority of partners, whatever they might have been, were suspended and modified by the special arrangement between them, under which this property was shipped. One of the joint owners, who had

no interest in this policy, was constituted supercargo, and as such, became the agent of the plaintiffs, so far as their interest was concerned. His rights and powers as partner, were suspended, and merged in his new character of supercargo; and he thereby parted with the possession and control of the property in transitu. His functions, as supercargo, did not commence until the arrival of the vessel at Canton. Upon the voyage the cargo was in the possession, and under the management and control of the master: He was the agent of the owners, and responsible to them under his bill of lading. It cannot be pretended that Thomas R. Keith, as part owner, would have had a right to demand of the master this specie, and to have invested it in cotton, or any thing else, if the voyage had not been broken up. A delivery of it to him would not have exonerated the master from his liability on the bill of lading; and if not, I am unable to see why the breaking up of the voyage should give to Thomas R. Keith any greater rights. The captain, thereupon, became the agent of the underwriters, and bound to them for the faithful discharge of his duty as such; and they became responsible for his acts. And the same rule applies to the supercargo; he becomes the agent of the underwriters. And the assured are not bound by his acts where there is a right to abandon. I do not, therefore, think that the plaintiffs' claim upon the underwriters is taken away by the acts of Thomas R. Keith, at the isle of France.

I have thus briefly noticed the several grounds which have been urged in support of the motion for a nonsuit, some of which are by no means free from difficulty; and I am not prepared to say, that I do not entertain doubts upon some of the questions that have been raised and discussed. From what has fallen from the bar, however, there is little reason to think that either party will be satisfied with the result of the trial here, but that the cause must ultimately go to the supreme court of the United States. Under such circumstances, I deem it most prudent and discreet, and best calculated to advance the ends of justice with as little expense and delay as practicable, to proceed in the cause, and have the whole merits of the case disclosed. And this course I should think advisable, even if I entertained stronger doubts than I do upon the questions which I have been called upon to decide. The motion for a nonsuit is accordingly overruled.

The defendants then proceeded with their defence, which was, that some of the stockholders of the Pacific Insurance Company were not citizens of New York. Having proved that three stockholders resided in other states, the court ordered the plaintiffs to be nonsuited.